# EXHIBIT A

Thomas L. Simek, tsimek@cftc.gov
Jennifer J. Chapin, jchapin@cftc.gov
Attorneys for Plaintiff
COMMODITY FUTURES TRADING COMMISSION
4900 Main Street, Suite 500
Kansas City, MO 64112
(816) 960-7700

SEAN D. REYES (7969)
Utah Attorney General
Thomas M. Melton (4999), tmelton@agutah.gov
Robert Wing (4445), rwing@agutah.gov
Jennifer Korb (9147), jkorb@agutah.gov
Paula Faerber (8518), pfaerber@agutah.gov
Assistant Attorneys General
Attorneys for Plaintiff
STATE OF UTAH DIVISION OF SECURITIES
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84114
(801) 366-0310

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, and<br><br>STATE OF UTAH DIVISION OF SECURITIES, through Attorney General, Sean D. Reyes,<br><br>      Plaintiffs,<br><br>v.<br><br>RUST RARE COIN INC., a Utah corporation, and GAYLEN DEAN RUST, an individual,<br><br>      Defendants; | COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES, AND OTHER EQUITABLE RELIEF<br><br><br>Case No.   2:18cv00892<br><br>Judge:    Bruce S. Jenkins |

and

DENISE GUNDERSON RUST, an individual,
JOSHUA DANIEL RUST, an individual,
ALEESHA RUST FRANKLIN, an individual,
R LEGACY RACING INC, a Utah
corporation, R LEGACY ENTERTAINMENT
LLC, a Utah limited liability company, and R
LEGACY INVESTMENTS LLC, a Utah
limited liability company.

    Relief Defendants.

Plaintiffs Commodity Futures Trading Commission ("CFTC") and the State of Utah

Division of Securities ("State of Utah"), by and through their undersigned attorneys, hereby

allege as follows:

## I. SUMMARY

1.    For over thirty years, Gaylen Dean Rust ("Rust") has owned and operated Rust

Rare Coin, Inc. ("RRC"), a retail coin shop in Salt Lake City, Utah that sold customers rare coins

and precious metals. From at least as early as 2008 and continuing through the present (the

"Relevant Period") Rust and RRC (collectively, "Defendants") also have engaged in a massive

scheme to defraud at least 200 individuals—from Utah and at least sixteen other states.

Defendants have fraudulently solicited over $170 million from investors between May 2013 and

August 2018 alone, and throughout the Relevant Period they have tricked investors into

believing that Defendants were pooling this money for the purpose of entering into contracts of

sale for silver, a commodity in interstate commerce (the "Silver Pool"). Defendants told

investors and prospective investors that they would sell silver held in the pool as market prices

rose and buy silver for the pool as market prices fell; thereby increasing the amount of silver held

in the Silver Pool, as well as the value of each investor's share in that pool. Defendants told

investors and prospective investors in the Silver Pool that by trading silver in this manner, they

generated extraordinarily high returns, averaging twenty to twenty-five percent per year and

sometimes as high as forty percent per year or more. Defendants provided investors with

account statements that showed Defendants selling silver at a higher price than they subsequently

repurchased it on every trade they executed on behalf of the Silver Pool—creating the impression

that the Silver Pool was a highly profitable investment. Defendants told investors that

Defendants possessed approximately seventy-seven to eighty million dollars of silver on behalf

of the Silver Pool and stored this silver at Brink's, Incorporated ("Brink's") depositories in Salt

Lake City, Utah and Los Angeles, California.

2.      The Silver Pool was a sham. Defendants did not use contributions from investors

to purchase silver for the Silver Pool. Instead, Defendants misappropriated investor funds and

used these funds to make payments to other investors, transfer money to other companies owned

by Rust, and pay personal expenses. Defendants never had a trading account in which they sold

and bought back physical silver for the Silver Pool, as falsely claimed in the account statements

they provided to investors. Defendants never earned the returns they touted to investors, and the

payments they made to investors throughout the Relevant Period consisted of funds provided by

other Silver Pool investors, not from profits generated from trading physical silver—in other

words payments in the manner of a Ponzi scheme. Although Defendants transferred a small

portion of investor contributions to accounts at several precious metals dealers, Defendants never

purchased and stored anything approaching the approximately seventy-seven to eighty million

dollars of silver they claimed to be storing at Brink's depositories in Salt Lake City and/or Los

3

Angeles.

3.      Throughout the Relevant Period, Defendants transferred large amounts of money they solicited and received from Silver Pool investors to Relief Defendants Denise Gunderson Rust ("Denise Rust"), Joshua Daniel Rust ("Joshua Rust"), Aleesha Rust Franklin ("Aleesha Franklin"), R. Legacy Entertainment, LLC ("R. Legacy Entertainment"), R. Legacy Racing Inc. ("R. Legacy Racing"), and R. Legacy Investments LLC ("R. Legacy Investments") (collectively, "Relief Defendants").  Relief Defendants used money contributed by investors to fund various personal and unrelated business expenses.

4.      Defendants' fraudulent scheme is ongoing.  In the first eight months of 2018, Defendants have received at least $42 million from Silver Pool investors and paid approximately $26 million back to Silver Pool investors.  Defendants have attempted to solicit new investors in the Silver Pool at least as recently as October 8, 2018.

5.      By engaging in this conduct and the conduct further described herein, Defendants have engaged, are engaging, or are about to engage in violations of the anti-fraud provisions of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2012), and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1-190 (2018), as well as the Utah Uniform Securities Act ("UUSA"), § 61-1-1 to 61-1-32.

6.      Unless restrained and enjoined by the Court, Defendants are likely to continue engaging in the acts and practices alleged in this Complaint or in similar acts and practices, and funds they have obtained fraudulently may be misappropriated or otherwise dissipated.

7.      Plaintiffs bring this action pursuant to Sections 6c and 6d of the Act, 7 U.S.C. §§ 13a-1, 13a-2 (2012), and Section 61-1-20 of the UUSA to enjoin Defendants' unlawful acts

and practices and to compel Defendants' compliance with the Act and the UUSA.

## II. JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331

(2012) (federal question jurisdiction) and 28 U.S.C. § 1345 (2012) (district courts have original

jurisdiction over civil actions commenced by the United States or by any agency expressly

authorized to sue by Act of Congress).  Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012),

authorizes the Commission to seek injunctive and other relief against any person whenever it

appears to the Commission that such person has engaged, is engaging, or is about to engage in

any act or practice constituting a violation of any provision of the Act or any rule, regulation, or

order thereunder.  Section 6d(1) of the Act, 7 U.S.C. § 13a-2(1) (2012), authorizes the State of

Utah to bring a suit in the district courts of the United States to seek injunctive and other relief

against any person whenever it appears to the Attorney General of Utah, or the administrator of

the securities laws of Utah, or such other official that Utah may designate, that the interests of

the residents of Utah have been, are being, or may be threatened or adversely affected because of

violations of the Act or Regulations.

9.     This Court has supplemental jurisdiction over the State of Utah's claims under

Utah law pursuant to 28 U.S.C. § 1367(a) (2012).

10.     Venue lies properly in this District pursuant to Section 6c(e) of the Act, 7 U.S.C.

§ 13a-1(e) (2012), because Defendants transacted business in this District, and certain of the acts

and practices in violation of the Act, the Regulations, and Utah law occurred, are occurring, or

are about to occur within this District, among other places.

## III. PARTIES

11.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and Regulations promulgated thereunder.

12.     Plaintiff **State of Utah Division of Securities** is the administrator of the securities laws of the state of Utah and is authorized under Section 6d of the Commodity Exchange Act, 7 U.S.C. § 13a-2 (2012), and Utah law, including Section 61-20-20(2)(a) of the UUSA, to bring this action on behalf of the State of Utah and its citizens to enforce Utah law (including the UUSA), the Act, and Regulations.

13.     Defendant **RRC** is a Utah corporation incorporated on October 5, 1983, with its principal place of business at 242 East 300 South, Salt Lake City, Utah 84111. RRC operates as a coin and precious metal dealer in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, RRC participated in the acts and practices set forth in this Complaint. RRC, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States. RRC has never been registered with the CFTC in any capacity. RRC has never been registered in any capacity within the securities industry in the State of Utah. RRC has never registered a securities offering in the State of Utah, it is not eligible for any applicable exemption from registration, and its securities are not federally-covered securities for which a notice filing has been made.

14.     Defendant **Rust** is an individual who resides in Layton, Utah. Rust is the sole owner of RRC and serves as RRC's President and sole Director. At all times material to this Complaint, acting alone or in concert with others, Rust formulated, directed, controlled, had the authority to control, or participated in the acts and practices of RRC described in this Complaint.

6

Rust, in connection with the matters alleged herein, transacts or has transacted business in this

district and throughout the United States.  Rust has never been registered with the CFTC in any

capacity.  Rust has never been registered in any capacity within the securities industry in the

State of Utah.

15.      Relief Defendant **Denise Rust** is an individual who resides in Layton, Utah.

Denise Rust is Rust's spouse.  She serves as RRC's Secretary and has signatory authority on

several of RRC's bank accounts.  Denise Rust assists in the day-to-day operations of RRC and

Rust's other business entities.  During the Relevant Period, Denise Rust received payments from

RRC into her personal bank accounts that included funds contributed to RRC by investors in the

Silver Pool for the purpose of investing in the Silver Pool.

16.      Relief Defendant **Joshua Rust** is a resident of Draper, Utah and the son of Rust

and Denise Rust.  Joshua Rust holds himself out as the manager of RRC, and he has signatory

authority on several RCC bank accounts.  Joshua Rust assists in the day-to-day operations of

RRC.  During the Relevant Period, Joshua Rust received payments from RRC into his personal

bank accounts that included funds contributed to RRC by investors in the Silver Pool for the

purpose of investing in the Silver Pool.

17.      Relief Defendant **Aleesha Franklin** is a resident of Homer, Alaska and the

daughter of Rust and Denise Rust.  During the Relevant Period, Aleesha Franklin received

payments from RRC into her personal bank account that included funds contributed to RRC by

investors in the Silver Pool for the purpose of investing in the Silver Pool.

18.      Relief Defendant **R Legacy Racing** is a Utah corporation incorporated on April

30, 2007, with its principal place of business at 2815 W. Gordon Avenue, Layton, Utah 84041.

Rust owns R Legacy Racing, and Rust and Denise Rust serve as its directors. During the Relevant Period, R Legacy Racing received payments from RRC into its bank accounts that included funds contributed to RRC by investors in the Silver Pool for the purpose of investing in the Silver Pool.

19.     Relief Defendant **R Legacy Entertainment** is a Utah limited liability company incorporated on December 1, 2009, with its principal place of business at 242 East 300 South, Salt Lake City, Utah 84111. Rust and Denise Rust are the only members of R Legacy Entertainment. During the Relevant Period, R Legacy Racing received payments from RRC into its bank accounts that included funds contributed to RRC by investors in the Silver Pool for the purpose of investing in the Silver Pool.

20.     Relief Defendant **R Legacy Investments** is a Utah limited liability company incorporated on March 27, 2002, with is principal place of business at 2815 West Gordon Avenue, Layton, Utah 84041. Rust is the sole member and manager of R Legacy Investments. During the Relevant Period, R Legacy Investments received payments from RRC into its bank accounts that included funds contributed to RRC by investors in the Silver Pool for the purpose of investing in the Silver Pool.

## IV.   FACTS

**A.    Defendants Engaged in a Scheme To Defraud Silver Pool Investors by Making False Representations and Omitting Material Facts, Misappropriating Investor Funds, and Providing False Account Statements**

1.     Defendants Solicited Individual Investors To Contribute to a Pooled Investment Involving Contracts of Sale for Silver, a Commodity in Interstate Commerce

21.     Defendants promoted the Silver Pool as an exclusive investment opportunity

8

reserved for individual investors with a personal or business connection to Rust. Defendants

solicited friends or business associates of Rust and/or customers of RRC to contribute money to

the Silver Pool. These friends and customers in turn spread word of the Silver Pool and the

investment returns Defendants were purportedly generating to certain friends and family, some

of whom also gave money to Defendants for the Silver Pool. Defendants pooled the

contributions they received from investors in two bank accounts in the name of RRC.

22.     Defendants told investors and prospective investors that they were using the

money contributed to the Silver Pool to purchase and store physical silver for investment. Under

Section 1a(9) of the Act, 7 U.S.C. § 1a(9) (2012), silver is a statutorily-defined commodity.

Defendants used the mails or other instrumentalities of interstate commerce to: (1) receive

checks from Silver Pool investors in the pool; (2) receive into their bank accounts wire transfers

from Silver Pool investors in the pool; (3) disseminate false account statements to Silver Pool

investors.

23.     Defendants' Silver Pool, which they operated and marketed to investors and

prospective investors, is an investment contract, which is a security under the UUSA. Silver

Pool investors have no role in Defendants' business operations and only provide investment

funds.

24.     Defendants did not provide Silver Pool investors with a written agreement or

contract setting forth the terms of the investment. In addition, Defendants did not provide Silver

Pool investors with a disclosure document such as an offering circular or prospectus. Silver Pool

investors received only a single-page receipt documenting the size of their contribution to the

Silver Pool.

25.    Defendants have been soliciting and receiving contributions for the Silver Pool

from investors and prospective investors since at least 2008.  Since 2013, Defendants have

received at least $170 million in contributions from investors for the Silver Pool.

        2.    <u>Defendants Falsely Represented that They Used Contributions to the
Silver Pool To Purchase and Trade Silver; Instead, Defendants
Misappropriated this Money for Personal Expenses and To Fund Rust's
Other Businesses</u>

26.    Defendants told investors and prospective investors that they used money

contributed to the Silver Pool to purchase physical silver, which they stored at one of two

Brink's storage facilities either in Salt Lake City, Utah or Los Angeles, California.  In 2018,

Defendants claimed that they held between seventy-seven and eighty million in the Silver Pool,

all of which was in the form of physical silver stored at these two Brink's depositories.

Defendants represented that investors could liquidate their investments and obtain the cash value

of their share in the Silver Pool at any time.  Defendants further represented to investors that

Defendants would sell silver held in the Silver Pool to fund any such liquidation request.

27.    Defendants claimed that they generated profits for investors by selling silver they

held in the Silver Pool either when market prices for physical silver began to rise or immediately

before those prices began to decline.  Defendants claimed that after market prices for silver

declined, they used the proceeds from their sale of silver to purchase a larger quantity of silver at

a lower price.  As a result of this trading, Defendants claimed that they were able to increase the

number of ounces of silver held in the Silver Pool and thus the value of each investor's share in

the Silver Pool. Defendants told investors and prospective investors that Defendants sold and

repurchased approximately fifty percent of the total amount of silver held in the Silver Pool in

each trade.

28.     Defendants told some Silver Pool investors and prospective investors that they were able to consistently sell silver at higher prices and purchase silver back at lower prices because they had advance knowledge of when market prices of silver would decline. Specifically, Rust claimed that he had a personal relationship with a commodity analyst at a large global bank and that Rust obtained information from this analyst regarding when that bank and other market participants planned to sell large quantities of physical silver, driving down market prices.

29.     Defendants told investors and prospective investors that by trading silver in this manner, Defendants were able to generate high rates of return for the Silver Pool.  Specifically, Defendants often told Silver Pool investors and prospective investors that Defendants were able to generate "consistent" returns of twenty to twenty-five percent through their selling and subsequent repurchase of silver.  Defendants told some Silver Pool investors and prospective investors that they had generated returns as high as forty percent between 2013 and 2018. Further, Defendants told some Silver Pool investors that their investments "doubled" in 2014.

30.     Defendants represented to Silver Pool investors and prospective investors that Rust had an account with HSBC Bank ("HSBC") through which Rust traded the silver held in the Silver Pool.  Defendants also told these investors and prospective investors that after selling and repurchasing silver through their HSBC account, Defendants received the additional silver they obtained through these trades at Brink's facilities in Salt Lake City, Utah and Los Angeles, California.

31.     The statements Defendants made to solicit investors and prospective investors to

11

contribute to the Silver Pool were false. Defendants do not currently store any physical silver at

Brink's facilities in Salt Lake City, Utah, Los Angeles, California, or anywhere else. Brink's has

never had a contract to store silver for RRC or Rust. In addition, storing the $77 million to $80

million worth of physical silver Defendants claimed to hold in the Silver Pool would cost in

excess of $100,000 per year in annual storage fees. Defendants have never paid Brink's any

annual storage fees, let alone annual storage fees approaching $100,000. Although at one time

prior to 2016 Brink's stored approximately $1 million worth of physical silver for Defendants,

this amount is far less than the amount of physical silver Defendants claimed to hold at the time

and the approximately $170 million Defendants have received from Silver Pool investors since

2013.

     32.    Furthermore, Defendants did not trade silver in the manner they described to

Silver Pool investors. Defendants never had a trading account with HSBC Bank ("HSBC")

through which they traded physical silver, as they represented to investors and prospective

investors.

     33.    Instead, Defendants misappropriated funds invested in the Silver Pool.

Defendants used money contributed by Silver Pool investors to pay personal expenses, such as,

for example, mortgage payments on the home of a family member of Rust. Defendants also used

money contributed by Silver Pool investors to make payments to other investors in the pool, in

the manner of a Ponzi scheme. Specifically, after receiving a new deposit from a Silver Pool

investor, Defendants frequently made smaller payments to several other Silver Pool investors out

of the same account without ever transferring funds to or from a trading account or any other

account that could be used to buy or sell silver or other precious metals.

34.     In addition, Defendants transferred money contributed by Silver Pool investors to other entities owned by Rust, including, but not limited to, Relief Defendants R. Legacy Entertainment, R. Legacy Racing, and R. Legacy Investments.  R. Legacy Entertainment did not own silver or other precious metals, or own any trading or other accounts used to buy or sell silver or other precious metals.  Instead, R. Legacy Entertainment operated a variety of businesses and charitable activities having no connection to the purchase and sale of silver, including a music recording studio, a video production business, and a catering and event planning business.  R. Legacy Racing did not own silver or own any trading or other accounts used to buy or sell silver or other precious metals.  Instead, R. Legacy Racing owned thoroughbred horses.

35.     Defendants also transferred money contributed by Silver Pool investors to several personal bank accounts, including personal bank accounts owned by Rust and Relief Defendants Denise Rust, Joshua Rust, and Aleesha Franklin, where it was used for a variety of personal expenses.

36.     For example, between January 1, 2018, and August 31, 2018, Defendants received over $42 million in new contributions from Silver Pool investors and deposited all these contributions in an account at Zion's Bank held in the name of RRC ending in 7496 (the "7496 Account").  During this time period, Defendants made approximately $28 million in payments from the 7496 Account to Silver Pool investors.

37.     Between January 1, 2018, and August 31, 2018, Defendants transferred approximately $7 million from the 7496 Account to RRC's other Zion's Bank accounts, where it was commingled with the revenue and expenses associated with RRC's coin shop business.

Defendants used $15,173,104 from a Zion's Bank account in the name of RRC ending in 3564

(the "3564 Account") to purchase precious metals and coins, both from wholesale precious

metals dealers and individuals.  During this same time period, Defendants also sold $9,338,421

in precious metals and coins to both wholesale precious metals dealers and individuals.  During

this time period, Defendants had net purchases of precious metals amounting to $5,834,683,

despite having received over $42 million from individuals for the purpose of purchasing precious

metals.

     38.     In addition, from January 1, 2018, to August 31, 2018, Defendants transferred

approximately $4.9 million from the 7496 Account to Relief Defendant R. Legacy

Entertainment.  Defendants transferred approximately $300,000 from the 7496 Account to Relief

Defendant R. Legacy Racing.  Defendants transferred approximately $654,920 from the 7496

Account to Relief Defendant R. Legacy Investments.  Because the amounts each of these Relief

Defendants received from the 7496 Account far exceed the approximately $48,000 Defendants

received into the 7496 Account from sources other than Silver Pool investors, the money

Defendants transferred to Relief Defendants from the 7496 Account consists almost entirely of

money contributed by Silver Pool Investors.  Relief Defendants R. Legacy Entertainment, R.

Legacy Racing, and R. Legacy Investments have no legitimate claim to the funds that they

received from this Zion's Bank account.

     39.     From January 1, 2018, to August 31, 2018, Defendants transferred approximately

$130,308 from the 7496 Account to Relief Defendant Denise Rust.  Again, the money

transferred to Denise Rust consisted largely of money contributed by Silver Pool investors.

Denise Rust has no legitimate claim to the funds that she received from this Zion's Bank

14

account.

40.     From January 1, 2018, to August 31, 2018, Defendants transferred approximately

$121,500 from the 7496 Account to Relief Defendant Aleesha Franklin.  Again, the money

transferred to Aleesha Franklin consisted largely of money contributed by Silver Pool investors.

Aleesha Franklin has no legitimate claim to the funds that she received from this Zion's Bank

account

41.     During this same time period, Defendants transferred approximately $292,384

from the 7496 Account to a Zion's Bank account in the name of Relief Defendant Joshua Rust

(the "Joshua Rust Account") and received approximately $407,735 from the Joshua Rust

Account into the 7496 Account.  This resulted in a net receipt of $115,351 from the Joshua Rust

Account.  During this same time period, Defendants transferred approximately $2,030,206 from

RRC's other bank accounts at Zion's Bank, including the 3564 Account, to the Joshua Rust

Account and received approximately $1,786,865 from the Joshua Rust Account.  As a result,

Defendants paid a net total of $243,341 from RRC's other bank accounts, including the 3564

Account, to the Joshua Rust Account.  Joshua Rust has no legitimate claim to the funds he

received from these other Zion's Bank accounts.

42.     Defendants knew that the statements and representations described above that

they made to Silver Pool investors and prospective investors were false when they made them.

Defendants intended to and did misappropriate the vast majority of Silver Pool investor funds

they received during the Relevant Period.

43.     In addition to the false statements described above, Defendants omitted material

facts when soliciting investors and prospective investors for the Silver Pool that were necessary

to make the statements made, in light of the circumstances under which they were made, not

misleading.  Specifically, Defendants omitted the following:

    a.    That Defendants would use Silver Pool investor funds to pay for personal and business expenses;

    b.    That Silver Pool redemptions would be paid out of money contributed by other investors and not sales of silver actually held by Defendants in storage facilities;

    c.    That Defendants would use Silver Pool investor funds to fund the activities of other businesses owned by Rust;

    d.    That Defendants were not licensed to sell securities, and the securities were not registered or exempt from registration; and

    e.    All of the information typically included in disclosure documents (offering memoranda or prospectus) that accompany the sale of securities.

44.    Throughout the Relevant Period, Defendants solicited most, if not all, investors

and prospective investors in the Silver Pool using some variant of the fraudulent statements and

misrepresentations described above.  In addition, Defendants omitted the facts described above

to most, if not all, investors and prospective investors in the Silver Pool in the course of

soliciting contributions from them.

3.    <u>Defendants Provided Investors with False Account Statements that Depicted Fictitious Trading Activity and Misstated the Amount of Silver Defendants Held in the Silver Pool</u>

45.    Defendants provided Silver Pool investors with account statements that purported

to show each trade involving silver Defendants executed on behalf of the Silver Pool.

Specifically, these statements purported to show the number of ounces of silver involved in each

sale, the price at which Defendants sold silver, the price at which Defendants repurchased the

silver, and the number of ounces by which the Silver Pool's holdings of silver increased as a

result of the trade.

46.     According to these account statements, Defendants successfully sold silver at a

higher price than they subsequently repurchased it on every single trade they executed on behalf

of the Silver Pool.  According to these account statements, Defendants increased the number of

ounces held in the Silver Pool on every trade they executed.

47.     These Silver Pool account statements were false.  Defendants never executed the

sales and repurchases of silver listed in each account statement.  In addition, Defendants

occasionally provided investors with account statements that listed inconsistent trade details

(such as price and quantity) for the same trade dates, despite Defendants' representation that they

traded a single account on behalf of the entire Silver Pool.

48.     These false account statements misrepresented the number of ounces of silver

allocated to individual investors in the Silver Pool.  As a result of these false account statements,

Silver Pool investors believed they owned a share in the Silver Pool equal to the value of the

number of ounces of silver indicated on the account statements and that Defendants were storing

silver on their behalf at Brink's storage facilities in Salt Lake City and/or Los Angeles.  In fact,

Defendants did not hold or possess, either on behalf of Silver Pool investors or in their own

names, the number of ounces of silver indicated on the account statements.

49.     Defendants prepared and disseminated to Silver Pool investors false account

statements that contained the false and misleading information described above throughout the

Relevant Period.  In fact, the account statements Defendants prepared and disseminated to Silver

Pool investors in 2008 closely resembled the form of the account statements they prepared and

disseminated to Silver Pool investors in 2018 and contained similarly false information regarding

17

trades Defendants claimed to have executed on behalf of the Silver Pool and the value of individual investors' shares in the Silver Pool.

50.     Defendants knew these account statements were false when they prepared and disseminated them to Silver Pool investors. Defendants prepared and disseminated these false account statements in order to perpetrate and conceal their fraud from Silver Pool investors.

**B.     Specific Examples of Defendants' Fraud**

51.     Defendants' fraudulent scheme, and the specific misrepresentations and misleading omissions they made to investors and prospective investors to solicit contributions to the Silver Pool, are illustrated by the following examples.

1.     Defendants Made Fraudulent Misrepresentations and Omissions to Silver Pool Investor D.C.

52.     Silver Pool investor D.C. is a Utah resident. In or around August 2017, D.C.'s friend and business associate, L.F., told him about Rust's Silver Pool. L.F. told D.C. that L.F. had been investing with Rust in the Silver Pool for approximately two years and had obtained good results.

53.     On August 9, 2017, D.C. invested $150,000 in Defendants' Silver Pool via two separate checks both payable to RRC. On January 22, 2018, D.C. invested an additional $400,000 in Defendants' Silver Pool, via check payable to RRC.

54.     In May 2018, D.C. met in person with Rust at RRC's retail store in Salt Lake City, Utah to learn more about the Silver Pool.

55.     During this May 2018 meeting, Defendants made the following misrepresentations to D.C. about the Silver Pool:

a.     Defendants use funds contributed to the Silver Pool to purchase physical

18

silver. Defendants store the silver they purchase for the pool with a local company.

b.   Rust uses an independent auditor to verify that the amount of silver shipped to the storage facility matches what Defendants purchased with investor funds.

c.   Defendants trade the silver held in the Silver Pool to generate investment returns for investors.

d.   Defendants' trading strategy is to sell the silver held in the Silver Pool when prices in the silver market go up. After prices in the silver market have come back down, Defendants buy silver back at a lower price with the proceeds of the sale, thus increasing the amount of silver held in the Silver Pool.

e.   Using this trading strategy, Defendants have generated returns averaging between fifteen percent and twenty-five percent per year.

f.   Defendants typically generate a profit from each sale and repurchase of silver they make. Only on a few rare occasions have Defendants made trades that did not generate a profit.

56.   After the May 2018 meeting with Rust, D.C. made four more contributions to the Silver Pool. On May 9, 2018, D.C. contributed $500,000 to the Silver Pool via check payable to RRC, which Defendants deposited in the 7496 Account. On May 16, 2018, D.C. contributed $1,000,000 to the Silver Pool via internal bank transfer to the 7496 Account. On May 23, 2018, D.C. contributed $500,000 to the Silver Pool via wire transfer to the 7496 Account. And on June 1, 2018, D.C. contributed $500,000 to the Silver Pool via check payable to RRC, which Defendants deposited in the 7496 Account.

57.   As of June 1, 2018, D.C. had contributed a total of $3,050,000 to the Silver Pool.

58.   D.C. did not receive an offering circular or prospectus prior to (or after) contributing money to the Silver Pool.

59.   D.C. had no involvement in the Silver Pool investment opportunity other than

providing investment funds.

60.     D.C. received monthly account statements from Defendants for the months of

July 2018 and August 2018.  These statements purported to show the quantity of silver allocated

to D.C.'s share in the Silver Pool, including the quantity of silver added to his investment as a

result of Defendants' trading activity.  According to these statements, Defendants executed one

trade in June 2018, nine trades in July 2018, and six trades in August 2018.  These statements

indicate the date of each sale and corresponding repurchase of silver executed by Defendants

during the relevant month, the quantity sold and repurchased, the price per ounce paid by

Defendants in each sale and repurchase, the total value of the amount of silver sold and

purchased, and the increase in the number of ounces of silver allotted to D.C.'s share in the

Silver Pool.  According to these statements, Defendants increased the number of ounces allotted

to D.C. in every sale and repurchase of silver they executed on behalf of the Silver Pool.

61.     The July and August 2018 statements Defendants provided to D.C. were false.

Defendants did not engage in the trades depicted on the statements.  Defendants did not increase

the amount of silver D.C. owned through his investment in the Silver Pool as reflected in these

statements.

62.     On or about August 31, 2018, D.C. asked Rust to return $1.5 million of D.C.'s

share in the Silver Pool.  At this time, according to the statements provided by Defendants,

D.C.'s share in the Silver Pool totaled $3,189,433.80.  D.C. told Rust he needed the funds by

September 12, 2018.

63.     Even though the Silver Pool account statements provided by Rust to D.C.

indicated that Defendants sold at least $1.5 million worth of silver on six dates in August 2018,

and had funds available to repurchase silver within at most four days of the sale, Rust told D.C.

that it would be difficult to liquidate $1.5 million of D.C.'s share of the Silver Pool by

September 12, 2018.

64.     In three separate wire transfers in September and October 2018, Defendants paid

to D.C. an amount equal to the total amount of D.C.'s original contributions to the Silver Pool

plus an additional amount intended to represent interest on the amount of those original

contributions.

> 2.     Defendants Made Fraudulent Misrepresentations and Omissions to Silver
> Pool Investor H.H.

65.     Investor H.H. is a Utah resident. H.H. was employed by RRC as an Information

Technology Specialist from July 2017 to July 2018. H.H. provided IT services to both RRC and

R Legacy Entertainment, as well as other entities owned and controlled by Rust.

66.     As part of H.H.'s compensation package, Defendants gave H.H. a $35,000 share

in the Silver Pool. Defendants explained to H.H. that they receive funds from investors to

purchase physical silver and trade that silver to generate profits for investors.

67.     Shortly after H.H. began working for RRC, H.H. explored making an additional

investment in the Silver Pool with his own funds. In early July 2017, H.H. met with Rust at

RRC's retail store in Salt Lake City to discuss this additional investment. During this meeting,

Defendants made the following misrepresentations to H.H. about the Silver Pool:

> a.     Defendants collect money contributed by investors and pool that money to
> purchase physical silver on behalf of the Silver Pool;

> b.     Defendants actually possess the silver they purchase on behalf of the
> Silver Pool and use Brink's to transport, secure, and store the silver;

21

    c.    Defendants generate trading profits for the Silver Pool by selling silver and then repurchasing it at a lower price in order to increase the number of ounces of silver held in the Silver Pool;

    d.    Specifically, Defendants receive information from a large global bank regarding when market participants intend to sell large quantities of silver and drive down the market price of silver. After receiving this information, Defendants sell approximately half of the silver held in the Silver Pool. After the market price of silver falls, Defendants use the proceeds from the sale of the silver to repurchase silver at the lower price;

    e.    Defendants trade silver on behalf of the Silver Pool through HSBC Bank;

    f.    Defendants measure the trading profits they generate through silver trading as the increase in the number of ounces generated by their sale and repurchase of silver. Defendants have never generated annual returns less than twenty percent and have generated annual returns as high as seventy percent; and

    g.    Over the three years prior to the meeting with H.H., Defendants generated annual trading profits between twenty-two and twenty-six percent each year.

68.    Following this meeting with Rust, H.H. decided to invest an additional $96,000 in the Defendants' Silver Pool. On or about July 6, 2017, H.H. hand-delivered a cashier's check to Rust in the amount of $96,000 made payable to RRC, which Defendants deposited in the 7496 Account.

69.    By July 7, 2017, Defendants disbursed all the money in the 7496 Account, including the money contributed by H.H. Between July 5th and July 7th, 2017, Defendants used the money in the 7496 Account to make payments to other investors; to fund transfers to Rust's other businesses, including Relief Defendants R. Legacy Entertainment and R. Legacy Racing; and to fund transfers to other accounts in the name of RRC, including the 3564 Account. Although Defendants later sent some money from the 3564 Account to Jack Hunt Coin Broker, Inc. ("Jack Hunt"), a wholesale precious metals dealer, the amount they sent to Jack Hunt was

far less that the $96,000 contributed by H.H.

70.    H.H. did not receive an offering circular or prospectus prior to (or after) investing

in the Defendants' Silver Pool. H.H. did not receive a written agreement outlining the terms of

his Silver Pool investment.

71.    Prior to accepting funds, Rust did not ask H.H. about the source of his funds, his

risk tolerance, or his net worth.

72.    H.H. had no involvement in the Silver Pool other than providing investment

funds.

73.    Defendants provided H.H. with a total of eight account statements that

purportedly depicted Defendants' trading activity on behalf of the Silver Pool and the value of

H.H.'s investment. H.H. received account monthly statements for July through October 2017,

and January through April 2018.

74.    In each of these ten months, H.H.'s account statements show an increase every

month in the number of ounces of silver purportedly owned by H.H. through his investment in

the Silver Pool. According to these statements, H.H. began with 8,074 ounces of silver in

July 2017 and owned 10,209 ounces by April 2018. The value of H.H.'s share in the Silver Pool,

according to these statements, increased from $131,000 to $176,077.72, a gain of approximately

thirty-four percent. The Silver Pool account statements provided by Defendants to H.H. were

false, and the investment returns reflected in them were fictitious. At no time between July 2017

and April 2018 did Defendants trade physical silver as shown in H.H.'s Silver Pool account

statements.

75.    In July 2018, RRC terminated H.H.'s employment for reasons unrelated to H.H.'s

involvement in the Silver Pool.  On August 6, 2018, H.H. went to RRC's retail store in Salt Lake

City to discuss with Rust his participation in the Silver Pool in light of his termination.

76.     During this August 6, 2018, meeting, Defendants made further misrepresentations

to H.H about the Silver Pool, including:

    a.    that over the past thirty years, Defendants have consistently generated
annual returns of twenty to twenty-five percent from trading physical
silver in the manner they previously described to H.H.  Defendants further
told H.H. that in his worst year they generated an annual return of twelve
percent.  Defendants told H.H. that over the last five years, the lowest
annual return they generated was forty percent;

    b.    that Defendants hold the physical silver owned on behalf of the Silver
Pool at Brink's facilities in Salt Lake City, Utah and Los Angeles,
California;

    c.    that Defendants trade the silver they own on behalf of the Silver Pool
through a single account with HSBC Bank; and

    d.    that Defendants receive information from a commodity analyst at a large
global bank regarding anticipated movements in the price of silver and use
this information to sell silver and repurchase it at a lower price.

77.     At the August 6, 2018, meeting, Defendants told H.H. that to liquidate his share in

the Silver Pool, he could either (1) take possession of the physical silver purchased with H.H.'s

investment funds, (2) take possession of gold and silver eagles (coins) in an equivalent value, or

(3) cash out the investment.

78.     On or about August 14, 2018, H.H. made a request to Defendants via telephone to

liquidate his share in the Silver Pool in the form of cash.  Approximately three weeks later, H.H.

received a wire transfer from RRC in the amount of $171,793.02, which purportedly included the

$35,000 Defendants told H.H. they contributed to the Silver Pool as part of H.H.'s compensation,

the $96,000 H.H. contributed himself, and investment gains purportedly resulting from

24

Defendants trading and reflected in the account statements Defendants provided to H.H.

Defendants did not sell silver to fund this wire transfer to H.H.; instead, Defendants used money

recently contributed by two other investors.

**C.      Defendants Continue To Solicit New Investors for Their Fraudulent Scheme**

79.      Defendants continue to solicit new investors for the Silver Pool by making the

same misrepresentations and omitting the same material facts as described above. In addition,

Defendants continue to make these misrepresentations and misleading omissions to current

Silver Pool investors, misappropriate Silver Pool investor funds, and provide existing Silver Pool

investors with false account statements that misrepresent the value of their interest in the Silver

Pool.

80.      For example, on September 6, 2018, Defendants solicited an FBI Special Agent

posing as a prospective investor in the same manner as they solicited investors and prospective

investors throughout the Relevant Period. At a meeting at RRC's retail store in Salt Lake City,

Utah, Defendants falsely stated to this FBI Special Agent:

a.      that all trades Defendants executed on behalf of the Silver Pool involved actual physical silver Defendants possessed and stored in Brink's storage facilities in Salt Lake City, Utah and Los Angeles, California, and that Defendants were in possession of, as of September 6, 2018, approximately $77 million in silver held in these storage facilities, when in fact Defendants had no silver stored with Brink's;

b.      that Defendants would use money contributed to the Silver Pool by new investors to purchase additional silver for the Silver Pool, when in fact Defendants used new contributions to make payments to existing investors and fund transfers to Rust's other businesses, only occasionally sending money to precious metals dealers;

c.      that Defendants had an account with HSBC Bank through which Rust traded silver on behalf of the Silver Pool, when in fact, neither Rust nor RRC had a trading account with HSBC;

d.　　that Rust had a "very good personal relationship" with a commodity
analyst at a global bank, who provided Rust with information regarding
the price levels at which market participants purportedly would sell silver
into the market and drive down the market price, allowing Rust to sell
silver held in the Silver Pool and repurchase it at lower price;

e.　　that investors in the Silver Pool could expect returns of approximately
twenty to twenty-five percent from Defendants' trading, and Defendants
had generated returns as high as 112 percent within the five years prior to
September 6, 2018, when in fact, Defendants did not sell and then
repurchase silver as described and never generated such investment
returns; and

f.　　any request by an investor to liquidate his or her share in the Silver Pool
would be funded by selling silver Defendants held in the Silver Pool,
when in fact Defendants funded such requests using new contributions
from new and existing Silver Pool investors.

**D.　　Rust Acted as a Controlling Person for RRC**

81.　　At all times during the Relevant Period, Rust was RRC's owner, sole director,

president, and registered agent.

82.　　During the Relevant Period, Rust made all financial and strategic business

decisions for RRC.

83.　　During the Relevant Period, Rust directed, among other things, the opening of

bank accounts and signing of documents on behalf of RRC.  In addition, Rust was a signatory on

each of RRC's bank accounts.

84.　　Rust knowingly induced RRC's fraudulent acts by virtue of directing those

fraudulent acts.

**E.　　Rust Acted as an Agent for RRC**

85.　　Rust acted as an agent for RRC.  He solicited investors on behalf of RRC,

generated Silver Pool account statements on behalf of RRC, and handled all Silver Pool investor

funds received by RRC.  As the owner, sole director, president, and registered agent of RRC,

Rust acted on behalf of RRC.

## V.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT I – AGAINST ALL DEFENDANTS

### FRAUD

**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2018)**

86.     The allegations in paragraphs 1 through 85 are re-alleged and incorporated herein

by reference.

87.     By reason of the conduct described above, Defendants Rust and RRC, since

August 15, 2011, in connection with a contract of sale of commodities in interstate commerce,

intentionally or recklessly:  (1) used or employed, or attempted to use or employ, manipulative

devices, schemes, or artifices to defraud; (2) made, or attempted to make, any untrue or

misleading statements of material fact or omissions of material fact; or (3) engaged, or attempted

to engage, in acts, practices, or courses of business, which operated or would have operated as a

fraud or deceit upon participants in the Silver Pool.

88.     By reason of the foregoing, Rust and RRC have violated and continue to violate 7

U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

89.     At all times relevant to this Complaint, Rust controlled RRC, directly or

indirectly, and did not act in good faith or knowingly induced, directly or indirectly, RRC's

conduct alleged in this Count; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b)

(2012), Rust is liable for RRC's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

90.     At all times relevant to this Complaint, Rust acted within the course and scope of

his employment, agency, or office with RRC.  Pursuant to Section 2(a)(1)(B) of the Act, 7

U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2018), RRC is liable as

principal for Rust's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

91.     Each act of using or employing, or attempting to use or employ, manipulative

devices, schemes, or artifices to defraud; making, or attempting to make, any untrue or

misleading statements of material fact or omissions of material fact; or engaging, or attempting

to engage, in acts, practices, or courses of business, which operated or would have operated as a

fraud or deceit upon participants in the Silver Pool, including, but not limited to, those

specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and

17 C.F.R. § 180.1(a)(1)-(3).

## VI.   VIOLATIONS OF THE UTAH UNIFORM SECURITIES ACT

### COUNT II – AGAINST ALL DEFENDANTS

**MISREPRESENTATIONS AND OMISSIONS MADE IN CONNECTION WITH THE
OFFER AND SALE OF SECURITIES**

**Violations of Section 61-1-1(2) of the UUSA
(Brought by Plaintiff State of Utah)**

92.     The allegations in paragraphs 1-85 are re-alleged and incorporated herein by

reference.

93.     Section 61-1-1(2) of the UUSA makes it unlawful:

> for any person, in connection with the offer, sale, or purchase of
> any security, directly or indirectly to:
> . . .

> make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in
> the light of the circumstances under which they are made, not
> misleading.

94.     As described herein, Defendants Rust and RRC have violated and continue to

violate Section 61-1-1(2) of the UUSA by, among other things, (i) telling investors that their

funds would be used to purchase physical silver which would secure the investment and be

stored at Brinks, when in fact, the majority of investor funds were used to pay Rust's personal

and business expenses, and to pay prior investors, and Brinks was not storing silver in that

quantity for the Defendants, and had no contract with Defendants to do so; (ii) telling investors

that half of the physical silver purchased with their investment funds would be traded by Rust

through a commodity account with HSBC bank, when in fact, the Defendants had no account

with HSBC; (iii) failing to tell investors that the Defendants were not licensed in the securities

industry; (iv) failing to provide investors with any disclosure documents such as a prospectus or

offering circular.

95.     Each untrue statement of a material fact or omission of a material fact, including

but not limited to those specifically alleged herein, is alleged as a separate violation of Section

61-1-1(2) of the UUSA.

## COUNT III – AGAINST ALL DEFENDANTS

## ACT, PRACTICE, OR COURSE OF BUSINESS WHICH OPERATED
## AS A FRAUD OR DECEIT

### Violations of Section 61-1-1(3) of the UUSA
### (Brought by Plaintiff State of Utah)

96.    The allegations in paragraphs 1-85 are re-alleged and incorporated herein by

reference.

97.    Section 61-1-1(3) of the UUSA makes it unlawful:

>  for any person, in connection with the offer, sale, or purchase of
>  any security, directly or indirectly to:
>  . . .
>  engage in any act, practice, or course of business which operates or
>  would operate as a fraud or deceit upon any person.

98.    As described herein, Defendants Rust and RRC have violated and continue to

violate Section 61-1-1(3) of the UUSA by, among other things, using investor funds for purposes

not disclosed to investors or approved by investors, such as for Defendants' personal and

business expenses, and payments to prior investors.

99.    Each act, practice, or course of business which operates or would operate as a

fraud or deceit upon any person, including but not limited to those specifically alleged herein, is

alleged as a separate violation of Section 61-1-1(3) of the UUSA.

### COUNT IV – AGAINST DEFENDANT GAYLEN RUST

### UNLICENSED BROKER-DEALER/AGENT

### Violations of Section 61-1-3 of the UUSA
### (Brought by Plaintiff State of Utah)

100.    The allegations in paragraphs 1-85 are re-alleged and incorporated herein by

reference.

101.    Section 61-1-3(1) of the UUSA makes it unlawful "to transact business in this

state as a broker-dealer or agent unless the person is licensed under this chapter."

102.    As described herein, Defendant Rust has violated and continues to violate Section

61-1-3(1) of the UUSA by, among other things, offering and selling RRC securities in and from

the State of Utah, in return for compensation from RRC, without a license.

### COUNT V – AGAINST DEFENDANT RRC

### EMPLOYING AN UNLICENSED AGENT

**Violation of Section 61-1-3 of the UUSA**
**(Brought by Plaintiff State of Utah)**

103.    The allegations in paragraphs 1-85 are re-alleged and incorporated herein by

reference.

104.    Section 61-1-3(2)(a) of the UUSA makes it unlawful "for a broker-dealer or issuer

to employ or engage an agent unless the agent is licensed."

105.    As described herein, Defendant RRC has violated and continues to violate Section

61-1-3(2)(a) of the UUSA by, among other things, employing or engaging Rust to offer and sell

RRC securities in and from the State of Utah, while Rust was unlicensed.

### COUNT VI – AGAINST ALL DEFENDANTS

### UNREGISTERED SECURITIES

**Violation of Section 61-1-7 of the UUSA**
**(Brought by Plaintiff State of Utah)**

106.    The allegations in paragraphs 1-85 are re-alleged and incorporated herein by

reference.

107.    Section 61-1-7 of the UUSA makes it unlawful "for any person to offer or sell any

security in this state unless it is registered under this chapter, the security or transaction is

exempted under Section 61-1-14, or the security is a federal covered security for which a notice

filing has been made pursuant to the provisions of Section 61-1-15.5."

108.    As described herein, Defendants have violated and continue to violate Section 61-

1-7 of the UUSA by offering and selling securities in Utah that are not registered under the

UUSA, that are not exempted under Section 61-1-14, and that are not federal covered securities

for which a notice filing has been made.

## VII.  RELIEF REQUESTED

The Commission and the State of Utah respectfully request that this Court, as authorized

by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.    Find that Rust and RRC violated Section 6(c)(1) of the Commodity Exchange

Act, 7 U.S.C. § 9(1) (2012), and Commission Regulation 180.1(a)(1)-(3), 17

C.F.R. § 180.1(a)(1)-(3) (2018);

B.    Find that Rust and RRC violated Sections 61-1-1(2), 61-1-1(3), 61-1-3, and 61-1-

7 of the UUSA;

C.    Enter an order of permanent injunction enjoining Rust and RRC, and their

affiliates, agents, servants, employees, successors, assigns, attorneys, and all

persons in active concert with them, who receive actual notice of such order by

personal service or otherwise, from violating 7 U.S.C. § 9(1) and 17 C.F.R.

§ 180.1(a)(1)-(3) as well as Sections 61-1-1(2), 61-1-1(3), 61-1-3, and 61-1-7 of

the UUSA.

D.    Enter an order of permanent injunction restraining and enjoining Rust and RRC,

and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1)      Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

2)      Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2018)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3)      Having any commodity interests traded on any Defendant's behalf;

4)      Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)      Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6)      Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2018);

7)      Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2018)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9); and

33

8)    Associating with a licensed broker-dealer or investment adviser in Utah, pursuant to Section 61-1-20 of the UUSA.

E.    Enter an order directing Rust and RRC, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act or Regulations, or Sections 61-1-1(2) or 61-1-1(3) of the UUSA, as described herein, from November 6, 2013, to the present, including pre-judgment and post-judgment interest.

F.    Enter an order directing Relief Defendants R Legacy Entertainment, R. Legacy Racing, R. Legacy Investments, Denise Rust, Joshua Rust, and Aleesha Franklin, including any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act or Regulations, or Sections 61-1-1(2) or  61-1-1(3) of the UUSA, as described herein, from November 6, 2013, to the present, including pre-judgment and post-judgment interest;

G.    Enter an Order requiring Rust and RRC to make restitution, pursuant to such procedure as the Court may order, to persons who have sustained losses proximately caused by Rust's and RRC's violations of the Act or Regulations, or

Sections 61-1-1(2) or 61-1-1(3) of the UUSA, as described herein, including pre-judgment and post-judgment interest;

H.    Enter an order directing Rust and RRC to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between Rust or RRC and any of the investors whose funds were received by Rust or RRC as a result of Rust's and RRC's violations of the Act or Regulations, or Sections 61-1-1(2) or 61-1-1(3) of the UUSA, as described herein;

I.    Enter an order directing Rust and RRC to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2012), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, title VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2018), for each violation of the Act or Regulations, as described herein, from November 6, 2013, to the present;

J.    Enter an order requiring Rust and Rust Rare Coin to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012);

K.    Enter an order appointing a receiver; and

L.    Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Dated: <u>November 13,</u> 2018   Respectfully submitted,

**COMMODITY FUTURES TRADING
COMMISSION**

By: <u>/s/ Thomas L. Simek</u>
Thomas L. Simek
tsimek@cftc.gov
Jennifer J. Chapin
jchapin@cftc.gov
Attorneys for Plaintiff
COMMODITY FUTURES TRADING
COMMISSION
4900 Main Street, Suite 500
Kansas City, MO 64112
(816) 960-7700

**SEAN D. REYES
UTAH ATTORNEY GENERAL**

By: <u>/s/ Thomas M. Melton</u>
Thomas M. Melton
tmelton@agutah.gov
Robert Wing
rwing@agutah.gov
Jennifer Korb
jkorb@agutah.gov
Paula Faerber
pfaerber@agutah.gov
Assistant Attorneys General
Attorneys for Plaintiff
STATE OF UTAH DIVISION OF SECURITIES
Utah Attorney General Office
160 East 300 South, Fifth Floor
Salt Lake City, Utah 84114
(801) 366-0310